**IN THE UNITED STATES BANKRUPTCY COURT**
**THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| | : | Chapter 7 |
| DAN RIVER HOLDINGS, LLC *et al.*[1], | : | |
| | : | Case No. 08-10726 (BLS) |
| | : | |
| Debtors. | : | |

| | | |
|---|---|---|
| JEOFFREY L. BURTCH, in his capacity as | : | (Jointly Administered) |
| Chapter 7 Trustee for the Estates of Debtors | : | |
| Dan River Holdings, LLC, *et al.*, | : | |
| | : | |
| Plaintiff, | : | Adversary No.:  __-_____ |
| | : | |
| v. | : | |
| | : | |
| WHITEFORD TAYLOR & PRESTON, LLC, | : | **JURY TRIAL DEMANDED** |
| WHITEFORD TAYLOR & PRESTON, LLP, | : | |
| and SCOULER & COMPANY, LLC, | : | |
| | : | |
| Defendants. | | |

<u>**COMPLAINT**</u>

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee ("Plaintiff") for the bankruptcy
estates of Dan River Holdings, LLC, *et al.*, (the "Debtors"), files this Complaint (the
"Complaint") against Whiteford Taylor & Preston, LLP, Whiteford Taylor & Preston, LLC, and
Scouler & Company, LLC, (collectively referred to as the "Defendants"), seeking legal damages
and equitable relief, and alleges as follows:

---

[1] The Debtors are the following entities:  Dan River Holdings LLC, Dan River, Inc., Dan River Factory
Stores, Inc., Dan River International Ltd. and The Bibb Company LLC.

1

## JURISDICTION AND VENUE

1.      Pursuant to 28 U.S.C. § 1334(b), this Court has jurisdiction over this adversary proceeding, which arises in and relates to a main case under Title 11, filed on April 20, 2008, in the United States Bankruptcy Court for the District of Delaware, Case No. 08-10726 (BLS).

2.      This Court has core jurisdiction over all claims for relief pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (H), and (O).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## THE PARTIES

4.      Jeoffrey L. Burtch is the Chapter 7 Trustee of the Estates of Dan River Holdings LLC, Dan River, Inc., Dan River Factory Stores, Inc., Dan River International Ltd. and The Bibb Company LLC.

5.      Defendant Whiteford, Taylor & Preston, LLP:

(a)      is a limited liability partnership registered in Maryland;

(b)      with a mailing address at Seven Saint Paul Street, Suite 1400, Baltimore Maryland, 21202;

(c)      Resagent, Inc. is the registered agent.  Resagent, Inc. has a mailing address at Seven Saint Paul Street, Suite 1400, Baltimore, Maryland, 21202; and

(d)      Martin T. Fletcher is the Managing Partner.  Mr. Fletcher has a mailing address of Seven Saint Paul Street, Suite 1400, Baltimore, Maryland, 21202.

6.      Defendant Whiteford, Taylor & Preston LLC (together with Defendant Whiteford, Taylor & Preston LLP, "WTP"):

(a)      is a limited liability company registered in Delaware;

2

(b)      with a mailing address at 1220 North Market Street, Suite 608, Wilmington, DE 19801;

(c)      Resagent, Inc. is the registered agent.  Resagent, Inc. has a mailing address at 1220 North Market Street, Suite 608, Wilmington, DE 19801; and

(d)      Martin T. Fletcher is the Managing Partner.  Mr. Fletcher has a mailing address of Seven Saint Paul Street, Suite 1400, Baltimore, Maryland, 21202.

7.      Defendant Scouler & Company:

(a)      is a limited liability company;

(b)      with a mailing address at 400 Colony Square, Suite 200, 1201 Peachtree Street, Atlanta, GA 30361;

(c)      The Corporation Service Company ("CSC") is the registered agent.  CSC has a mailing address of 1209 Orange Street, Wilmington, DE 19801; and

(d)      Dan Scouler is the Managing Principal.  Dan Scouler has a mailing address of 1800 Century Park East, Suite 600, Los Angeles, CA 90067.

## FACTS

### Scouler & Company Begins Working with Debtors

8.      During or around February 2008, Dan River Holdings LLC, Dan River, Inc., Dan River Factory Stores, Inc., Dan River International Ltd., and The Bibb Company LLC (collectively, the "Debtors"), engaged Scouler & Company ("Scouler") to assist the Debtors in managing their business and to prepare for reorganization under Chapter 11 of the Bankruptcy Code.

9.      Throughout Scouler's work with the Debtors, John Hedge was Scouler's main representative.  Mr. Hedge is a Principal in Scouler and has extensive experience in providing

restructuring advisory services and restructuring management services in reorganization proceedings. At all times complained of in this Complaint, Mr. Hedge acted for and on behalf of Scouler.

10.    Prior to the Debtors' bankruptcy, Scouler was extensively involved in the Debtors' reorganization efforts. Scouler, among other matters, worked to obtain post-petition financing. Scouler also alerted the Debtors' constituencies about the Debtors' businesses.

11.    As early as February 25, 2008, Scouler had analyzed the Debtors' real estate leases. Scouler included these leases on a chart listing the property, landlord, tenant, and other items, including notes about the specific properties.

12.    On April 11, 2008, the Debtors paid Scouler a $50,000 retainer in anticipation of the work Scouler was to provide prior to the filing of the Chapter 11 petition. On April 15 and 16, 2008, the Debtors made two payments to Scouler, totaling $202,044.25 for fees and expenses incurred prior to the petition's filing.

**The Debtors File Voluntary Chapter 11 Petitions**

13.    On April 20, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for bankruptcy relief under Chapter 11 of the Bankruptcy Code. WTP served as the Debtors' Chapter 11 bankruptcy counsel.

14.    According to the Debtors' Written Action of Sole Member, attached as Exhibit A to the Debtors' bankruptcy petitions, the Debtors were authorized to retain WTP "to render legal services to and to represent the [Debtors] in connection with such Chapter 11 proceedings and other related matters in connection therewith[.]"

15.    On May 19, 2008, the Court entered its *Order Granting Application for Authority to Employ Whiteford, Taylor & Preston LLP* as attorneys for the Debtors. A copy

4

of the Debtors' Application to Employ Whiteford, Taylor & Preston LLP (the "WTP Application") is annexed hereto as <u>Exhibit 1</u> and incorporated herein by reference.

16.     The WTP Application stated that WTP would, *inter alia*:

(a)     "provide legal advice with respect to the Debtors' powers and duties as Debtors-in-possession in the continued operation of their businesses and management of their property;"

(b)     prepare "on behalf of the Debtors all applications, motions, . . . and other legal papers necessary to the administration of the Debtors' estates;" and

(c)     negotiate, draft, and pursue "such asset dispositions, restructurings, plans of reorganization or liquidation, and recapitalizations or refinancing as needed[.]"

17.     The Debtors paid WTP a retainer of $185,000.00 on April 17 and 18, 2008, "to be applied against WTP's allowed fees and expenses, as permitted by the Court."

18.     WTP applied approximately $80,000.00 of this retainer to prepetition fees and services related to the preparation of the Chapter 11 filing.

19.     At all times relevant hereto, WTP's attorneys acted within the scope of their employment.

### Scouler is Retained as Chief Restructuring Officer

20.     On April 22, 2008, the Debtors filed their motion for authority to retain Scouler to provide a Chief Restructuring Officer and additional personnel to assist the Debtors with the reorganization (the "Scouler Application").  The Scouler Application specifically sought the appointment of Mr. Hedge as the Chief Restructuring Officer. A copy of the Scouler Application is annexed hereto as <u>Exhibit 2</u> and incorporated herein by reference.

21.     On May 19, 2008, the Court entered an order approving the Scouler Application (the "Scouler Order").  The Scouler Order appointed Mr. Hedge as the Debtors' Chief Restructuring Officer.  A copy of the Scouler Order is annexed hereto as <u>Exhibit 3</u> and incorporated herein by reference.

22.     The Scouler Application included as an exhibit the executed engagement letter outlining Scouler's contractual responsibilities.  The engagement letter stated that Scouler would, *inter alia*:

(a)     report directly to the Debtors' Board of Directors;

(b)     develop and implement a business plan to restructure, liquidate or otherwise maximize the value of the Dan River Entities;

(c)     provide consultation and assistance in connection with any going concern divestitures as part of the business plan; and

(d)     provide other similar services necessary to maximize recovery of the Dan River Entities.

23.     In addition to the terms of the engagement letter, Scouler's relationship with the Debtors included certain actions such as making recommendations to the Debtors' Board of Directors on which of the Debtors' bills and obligations to pay based on the Debtors' financial state.  At all times relevant hereto, Scouler's representatives acted within the scope of their employment.

**The NY Leases**

24.     Pursuant to a lease dated as of June 23, 1995 between Dan River, Inc. and 1325 Avenue of the Americas, L.P. (the "Landlord"), Dan River, Inc. leased through June 30, 2011 (the "Termination Date") the entire fourteenth floor and part of the twelfth floor of 1325

Avenue of the Americas, New York, NY (the "Lease").   For all relevant purposes, Paramount Group, Inc. ("Paramount") acted as Agent for the Landlord.

25.     Section 1.3 of the Lease stated that "[t]he rents under this lease shall consist of (a) fixed rent . . . in the amounts per annum set forth in Exhibit C, and (b) additional rent . . . consisting of all other sums of money that become due . . . ."  The calculation of additional rent is set forth in the Lease.  Exhibit C to the Lease stated Dan River, Inc.'s annual rent obligation for the first five years at $1,377,000.00 per year, $1,530,000.00 per year for the second five years, and $1,683,000.00 per year for the last five years of the Lease term.

26.     As of the Petition Date, Dan River, Inc. was in the third five-year period of the lease, with a yearly fixed rent obligation of $1,683,000.00, payable in monthly installments of $140,250.00 (the "Lease Rent").

27.     Pursuant to a sublease, dated as of December 31, 2006 by and between Dan River, Inc. and LeBoeuf, Lamb, Greene & MacRae LLP n/k/a Dewey & LeBoeuf ("LeBoeuf"), and set to expire one day before expiration of the Lease, LeBoeuf subleased the fourteenth floor of 1325 Avenue of the Americas from Dan River, Inc.

28.     According to LeBoeuf's sublease, LeBoeuf's monthly fixed rent obligation to Dan River, Inc. on the fourteenth floor space was $82,316.67.  LeBoeuf's sublease contained similar provisions to the Lease for additional rent payments.  LeBoeuf's sublease provisions for additional rent were a pass-through of Dan River, Inc.'s additional rent obligations on the Lease of the fourteenth floor.  The Landlord consented to LeBoeuf's sublease.

29.     Pursuant to an amendment to LeBoeuf's sublease, dated as of April 30, 2007, by and between Dan River, Inc. and LeBoeuf, co-terminus with LeBoeuf's sublease, this

sublease was amended to include a portion of the twelfth floor of 1325 Avenue of the Americas (the "Amendment").

30.     While the majority of the terms and conditions of the Lease and LeBoeuf's sublease remained in effect, the fixed rent for the twelfth floor space was $914,592.00 per annum, or $76,216.00 per month.  This increased LeBoeuf's monthly fixed rent obligation to Dan River, Inc. to $158,532.67 (the "Sublease Rent").  (Hereinafter, LeBoeuf's sublease and the Amendment will be referred to collectively as the "Sublease.")

31.     LeBoeuf's additional rent obligations also increased as a result of the Amendment.  Under the Sublease, LeBoeuf's responsibility for payments of additional rent as defined by the Lease equaled a whole pass through of Dan River, Inc.'s additional rent responsibilities to the Landlord.

32.     The Sublease Rent exceeded the Lease Rent by $18,282.67 per month. (Hereinafter, the Lease and Sublease will be referred to collectively as the "NY Leases.")

<u>**Scouler Recognizes the Positive Value of the NY Leases**</u>

33.     As stated above in paragraph 11, Scouler recognized the positive cash flow generated by the NY Leases as early as February 2008.

34.     Scouler produced numerous financial reports stating cash flow on a weekly and monthly basis (collectively, the "Financial Reports").  By June 2008, Scouler included both Dan River, Inc.'s and LeBoeuf's monthly obligations on the NY Leases as explicit and separate line items on the Financial Reports.

35.     The Financial Reports consistently showed a significant positive cash flow stemming from the NY Leases.

36.     Throughout the Chapter 11 proceedings, Scouler recognized the positive cash flow created by the NY Leases.  During that time, Scouler generated numerous documents pertaining to the need to preserve and/or monetize the positive cash flow created by the NY Leases.  These documents included notations such as "offset with rental income above-need to assume this lease in court."

37.     Scouler also memorialized its understanding of the significance of the NY Leases in email, internal memoranda, and cash flow forecast spreadsheets.  These documents also contained statements acknowledging that Scouler was aware that the NY Leases needed to be assumed through Court proceedings if their value was to be realized.

38.     In the face of Scouler's knowledge of the positive value created by the NY Leases, it was Scouler's responsibility to recommend that the Debtors' Board of Directors pay Dan River, Inc.'s obligations on the Lease so as to preserve and maximize its value to the Debtors' businesses.

**WTP Seeks and Obtains an Extension under 11 U.S.C. § 365**

39.     As early as April 2008, WTP had documentation showing the positive cash flow provided to the Debtors by the NY Leases.  This documentation included internal notes that the Sublease should not be rejected at that time.

40.     Pursuant to 11 U.S.C. § 365(d)(4)(A)(i), the initial 120-day period to assume unexpired non-residential leases would expire on August 18, 2008 (the "Initial Rejection Deadline").

41.     On July 15, 2008, WTP filed a motion pursuant to 11 U.S.C. § 365(d)(4)(B) to extend the time to assume the non-residential unexpired leases for an additional 90 days beyond the Initial Rejection Deadline.  On August 5, 2008, the Court entered an order

9

extending the deadline to assume or reject unexpired leases until November 16, 2008 (the "Revised Rejection Date").

42.     With respect to the Debtors' other leases subject to 11 U.S.C. § 365(d)(4) (the "Other Leases"), Scouler and WTP actively communicated in writing about the economics and/or the needs of the Debtors concerning those Other Leases.

43.     With respect to the Other Leases, Scouler and WTP actively communicated in writing about whether to extend the time to assume or reject the Other Leases, or whether to assume or reject such Other Leases.

44.     With respect to the NY Leases, prior to the Revised Rejection Date, Scouler and WTP did not actively communicate with one another in writing (if ever) about the economics and/or the needs of the Debtors with respect to the NY Leases.

45.     With respect to the NY Leases, prior to the Revised Rejection Date, Scouler and WTP did not actively communicate with one another in writing (if ever), about whether to extend the time to assume or reject the NY Leases, or whether to assume or reject such NY Leases.

46.     Scouler never communicated to WTP in a timely fashion the need to further extend the time to assume or reject the NY Leases beyond the Revised Rejection Date.

47.     Scouler never communicated to WTP in a timely fashion the need to further extend the time to monetize the positive cash flow generated by the NY Leases.

48.     Neither Scouler nor WTP sought the consent of the Landlord or Paramount to obtain any additional extension of time to assume the unexpired non-residential leases at any time during the pendency of the Chapter 11 cases as was required by 11 U.S.C. § 365(d)(4)(B)(ii).

49.     Neither Scouler nor WTP took any action with respect to assuming the NY Leases at any time prior to the Revised Rejection Date.

50.     Neither Scouler nor WTP took any action to cure any deficiencies on the NY Leases as was required for assumption pursuant to 11 U.S.C. § 365(b)(1)(A).  Nor did either Scouler or WTP seek to provide adequate assurance that such deficiency would be promptly cured.

51.     Neither Scouler nor WTP took any action to shop, sell, re-let, or assign the NY Leases at any time prior to the Revised Rejection Date.

52.     Neither Scouler nor WTP took any action to market the NY Leases or find potential assignees for the NY Leases.

53.     Neither Scouler nor WTP took any action to acquire adequate assurance of future performance by potential assignees pursuant to 11 U.S.C. § 365(f)(2)(B).

## NY Leases Rejected

54.     Scouler was aware that the deadline in which to assume or reject the Debtors' leases was set to expire.  As the deadline approached however, Scouler never acted or requested that WTP take legal steps in Court regarding the assumption of the NY Leases, or any other steps to monetize the value of the NY Leases.  Indeed, lead counsel for WTP has asserted that he was unaware of what efforts, if any, Scouler undertook to evaluate the economics of the NY Leases.

55.     Prior to the NY lease rejections, neither Scouler nor WTP communicated with either LeBoeuf or Paramount Group, Inc. (the agent for Landlord) as to extension of time for Debtor to assume, assume and assign or reject the NY Leases.

56.     On November 17, 2008, the NY Leases were deemed rejected by operation of law.

57.     The rejection of the NY Leases was solely attributable to the Defendants' failure to (i) assume or assume and assign the NY Leases or (ii) extend the period for assumption, assumption and assignment, or rejection of unexpired leases pursuant to 11 U.S.C. § 365(d)(4)(B)(ii).

58.     The Defendants' failure to assume and/or monetize the positive cash flow generated by the NY Leases eliminated at least $18,282.67 per month in positive cash flow to Dan River, Inc.  When this monthly positive cash flow is multiplied by the remaining 31 months of the NY Leases (from the Revised Rejection Date to the Termination Date), the Defendants' failure resulted in at least $566,762.77 of unrealized positive cash flow to the Debtors, together with interest from the date of each monthly payment.

59.     Indeed, despite its obligations as bankruptcy counsel to the Debtors, WTP was unaware that the Sublease had been rejected by operation of law.  As bankruptcy counsel, WTP was obligated to have expert knowledge of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

60.     WTP demonstrated that it understood the importance and time for filing of a motion for extension of time to assume or reject the NY Leases in the filing for and additional 90 days prior to the running of the initial 120 days of the petition date.

61.     WTP failed to advise Scouler in writing prior to the Revised Rejection Date that the NY Leases would terminate by operation of law on the Revised Rejection Date.

62.     According to WTP, each of Scouler and the Debtors made a business decision to not assume the NY Leases.  However, there are no contemporaneous memoranda,

correspondence or e-mails (i) that demonstrate an understanding of the consequences of the failure to deal timely with the NY Leases; (ii) that establish the basis for the business decision or (iii) that memorialize that the issue was raised with the Debtors' board of directors in a timely manner, if at all or (iv) that the board of directors, with proper, adequate and timely knowledge of the issue, made an informed business decision to direct the actions of Scouler.

63.     However, after the Revised Rejection Date, Scouler generated internal economic analysis documents indicating its belief that the NY Leases were not terminated.

64.     Indeed, after the Revised Rejection Date, Scouler generated internal documents indicating its belief that the positive cash flow generated by the NY Leases could still be monetized for the benefit of the Debtors.

65.     WTP, as the Debtors' Chapter 11 counsel, never took on a substantive role in the Debtors' affairs with respect to the Debtors' leases.  WTP was unaware of any efforts taken by the Debtors or Scouler regarding the treatment of the Debtors' real estate holdings.

66.     WTP unreasonably believed its involvement in the area of the Debtors' real estate was merely to await instructions from the Debtors and Scouler regarding treatment of any leases, in contradiction to WTP's stated obligations in its retention agreement.

67.     Over the course of WTP's representation of the Debtors, however, WTP focused significant efforts on the Debtors' real estate holdings and leases.  This included, but was not limited to, research, review, and analysis of the Debtors' commercial real estate.

68.     WTP believed that Scouler was attempting to liquidate the NY Leases. Nonetheless, WTP never reached out to the Landlord to effectuate, at a minimum, a further extension of the period in which to assume and assign leases.

69.    Upon information and belief, Scouler was not seeking the liquidation of the NY Leases.  Early on in the Chapter 11 case, and at least through September 2008, Scouler thought it was acceptable not to take steps to monetize the positive cash flow generated by the NY Leases.  Scouler at no time after September 2008 took steps to monetize the positive cash flow generated by the NY Leases.

70.    Upon information and belief, WTP never informed Scouler or the Debtors' Board of Directors that rejection of the NY Leases would cause lease rejection and cure claims to be filed against the Debtors.

71.    Neither Scouler nor WTP communicated with LeBoeuf concerning the status of the NY Leases, including the possibility of assuming and assigning the NY Leases.

72.    Neither Scouler nor WTP attempted to engage LeBoeuf in discussions concerning assumption, purchase, or liquidation of the NY Leases, including the Sublease, in which LeBoeuf had a significant interest.

73.    Though Scouler sought liquidation of many of the Debtors assets, Scouler did not make any attempts to liquidate the NY Leases to LeBoeuf or any other party.

**Paramount's Claims Against the Debtors**

74.    Following the rejection of the NY Leases by operation of law, Paramount filed Claim Nos. 401 and 402 against Dan River, Inc.

75.    Claim No. 401 sought an unsecured claim of $2,311,315.18 for "[d]amages due to rejection of lease," ostensibly a rejection damage claim, pursuant to 11 U.S.C. §§ 365 and 502(b)(6).

76.     Claim No. 402 sought an administrative expense of $172,601.24 for "[r]ent and additional rent" incurred but not paid between the Petition Date and the Revised Rejection Date.

77.     Paramount also filed unsecured Claim No. 139 against Dan River, Inc. Paramount asserted Claim No. 139 in the amount of $136,295.10 for rent and utilities due from Dan River, Inc. to Paramount arising prior to the Petition Date.

78.     Pursuant to the conversion of these bankruptcy cases, discussed below, these claims continue against the Chapter 7 Estates (the "Estates").

79.     Scouler and WTP are obligated to the Estates by way of damages for the full amount of any claim that the Estates incur from dealing with the Paramount Proofs of Claim.

80.     The Trustee has incurred and will incur additional professional fees as a result of these claims filed against the Estates.

### LeBoeuf's Claims Against the Debtors

81.     One month after the rejection of the NY Leases, LeBoeuf filed Claim Nos. 388, 389, 390, 391, 392, 393, 394, 395, 396, and 397 against the Debtors.

82.     LeBoeuf filed unsecured Claim Nos. 388 through 392 in the amount of $1,129,376.00 each for increased expenses due on the Sublease pursuant to an attornment agreement with the Landlord.  Each of Claim Nos. 388 through 392 is substantively identical except that each was filed against a specific individual Debtor.

83.     By Claim Nos. 388 through 392, LeBoeuf asserts that it was harmed by the rejection of the NY Leases.  Through these claims, LeBoeuf sought recovery of that harm from the Debtors.

84.     LeBoeuf also filed Claims Nos. 393 through 397 in the amount of $70,801.44 each, the pro-rated portion of rent due to Paramount in November 2008 stemming from LeBoeuf's payment of Dan River Inc.'s obligations that were unpaid following the rejection of the NY Leases by operation of law.  LeBoeuf asserted 11 U.S.C. § 507(a) priority on each of these claims, but did not specify to which level of priority the claims were entitled.  Each of Claim Nos. 393 through 397 is substantively identical, except that each was filed against a specific individual Debtor.

85.     Pursuant to the conversion of these bankruptcy cases, discussed below, these claims continue against the Estates.

86.     Scouler and WTP are obligated to the Estates by way of damages for the full amount of any claim that the Estates incur from dealing with the LeBoeuf Proofs of Claim.

87.     The Trustee has incurred and will incur additional professional fees as a result of these claims filed against the Estates.

## Cases Convert to Chapter 7

88.     On December 9, 2008, just weeks after the NY Leases were rejected by operation of law due to the Defendants' inaction, the Official Committee of Unsecured Creditors (the "Committee") in the Debtors' Chapter 11 cases moved to convert the cases to cases under Chapter 7 of the Bankruptcy Code.  The Committee highlighted substantial and continuing losses and mismanagement of the Chapter 11 estates in support of its motion.

89.     On December 15, 2008, the Court entered an order converting the cases to cases under Chapter 7 of the Bankruptcy Code, effective December 17, 2008 at 12:00 noon.

90.     On December 17, 2008, Jeoffrey L. Burtch was appointed as Chapter 7 interim Trustee pursuant to § 701 of the Bankruptcy Code.  The Trustee now serves as the Trustee of the Estates pursuant to § 702(d) of the Bankruptcy Code.

## Scouler's Fees

91.     During the Debtors' Chapter 11 proceedings, Scouler invoiced $2,578,035.13 to the Debtors (the "Scouler Fees").  Of that total, Scouler received $2,015,561.28 from the Debtors (the "Scouler Payments").  Scouler never sought the Court's approval for the Scouler Payments.

92.     The Scouler Payments pertained to work performed post-petition.

93.     The Scouler Payments are in addition to prepetition payments received by Scouler from the Debtors.  These prepetition payments consisted of $202,044.25 in expenses and a $50,000 retainer payment made in anticipation of Scouler's post-petition services.

94.     On January 29, 2009, Scouler submitted its Line Submitting Final Fee Report (the "Scouler Final Fee Report") to the Court.  The Scouler Final Fee Report sought $525,923.85 in unpaid fees.

95.     Thereafter, Scouler filed its Application for Allowance and Payment of Chapter 11 Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1) [Docket No. 648, Filed 6/8/09] (the "Scouler Chapter 11 Claim").  The Scouler Chapter 11 Claim requested allowance of the amount of $525,923.85.

96.     On October 7, 2010, following the Trustee's Objection to the Scouler Final Fee Report, Scouler withdrew its request for authorization of payment of the $250,000 Success Fee.  Scouler therefore reduced the amount of unpaid fees it sought to $275,923.85.

17

## Whiteford Taylor & Preston's Fee Applications

97.     On September 28, 2008, WTP filed their First Interim Application for Compensation and Reimbursement (the "First WTP Fee App"). The First WTP Fee App requested compensation for $906,013.00 in fees and reimbursement of $31,449.41 in expenses incurred between the Petition Date and June 30, 2008 (the "First Interim Period").

98.     The First WTP Fee App stated that $756,259.81 of the requested amounts had been paid. This represented 80% of the fees and 100% of the expenses incurred during the First Interim Period.

99.     On October 9, 2008, the Court entered an order approving payment of the First WTP Fee App on an interim basis (the "First Interim Fee Order"). The First Interim Fee Order authorized payment of 100% of unpaid fees and expenses.

100.     On December 2, 2008, WTP filed their Second Interim Application for Compensation and Reimbursement (the "Second WTP Fee App"). The Second WTP Fee App requested compensation for $570,035.00 in fees and reimbursement of $15,020.07 in expenses incurred between July 1, 2008 and September 30, 2008 (the "Second Interim Period").

101.     The Second WTP Fee App stated that $471,448.07 of the requested amounts had been paid. This represented 80% of the fees and 100% of the expenses incurred during the Second Interim Period.

102.     The Court never approved the Second WTP Fee App.

103.     On January 29, 2009, WTP filed their Third Interim and Final Application for Compensation and Reimbursement (the "Final WTP Fee App"). The Final WTP Fee App requested compensation for $235,873.00 in fees and reimbursement of $5,661.76 in expenses incurred between September 30, 2008 and December 17, 2008 (the "Third Interim Period").

104.     The Final WTP Fee App stated that $194,360.16 of the requested amounts had been paid.  This represented 80% of the fees and 100% of the expenses incurred during the Third Interim Period.

105.     The Court never approved the Final WTP Fee App.

106.     In the Final WTP Fee App, WTP further sought allowance of $1,712,421.00 in legal fees and $52,131.24 in expenses on a final basis.

<u>COUNT I</u>

<u>Breach of Fiduciary Duties of Whiteford Taylor & Preston LLP</u>

107.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 106 above as if set forth in full herein.

108.     The Debtors retained WTP to serve as their attorneys.

109.     As the Debtors' attorneys, WTP stood in a fiduciary relationship with the Debtors.

110.     WTP owed fiduciary obligations to the Debtors, including the duty of care.

111.     WTP failed to analyze the economics of the NY Leases.

112.     WTP failed to communicate with Scouler to learn the economics of the NY Leases.

113.     WTP failed to advise the Debtors of the favorable economics of the NY Leases.

114.     WTP failed to advise the Debtors to assume, assign, or to otherwise monetize the positive cash flow created by the NY Leases.

115.     WTP failed to advise the Debtors of the negative effects of the termination of the NY Leases, including that termination would give rise to claims by Paramount against the Debtors, and would give rise to claims by LeBoeuf against the Debtors.

116.     WTP violated the duty of care owed to the Debtors in its failure to recommend to the Debtors that Dan River Inc. should assume the NY Leases, which had significant value to the Debtors.

117.     WTP violated the duty of care by its failure to request from the Landlord permission for an extension of the Revised Rejection Deadline as was required by 11 U.S.C. § 365(d)(4)(B)(ii).

118.     WTP violated the duty of care owed to the Debtors in its failure to extend the Revised Rejection Deadline, so as to preserve the NY Leases, which had significant value to the Debtors.

119.     WTP violated the duty of care by its failure to provide legal representation regarding the Debtors' affairs so as to preserve the Estates and any positive value therein.

120.     By the aforementioned conduct, WTP breached its fiduciary duties and obligations owed to the Debtors.

121.     WTP's breach of the aforementioned fiduciary duties caused damage to the Estates in the amount of at least $566,762.77 of lost positive cash flow generated by the NY Leases, plus interest.

122.     WTP's breach of the aforementioned fiduciary duties caused damage to the Estates as a result of the claims filed by Paramount and LeBoeuf.

123.     The Trustee is entitled to recovery of damages done to the Estates caused by WTP's breach of the aforementioned duties.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order awarding compensatory, consequential, and additional damages against WTP in such amount as to be determined by the Court, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT II

### Breach of Fiduciary Duties of Scouler

124.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 123 above as if set forth in full herein.

125.    The Debtors retained Scouler to serve as their Certified Restructuring Officer.

126.    Scouler's engagement as the Debtors' Certified Restructuring Officer placed it in the Debtors' shoes.

127.    As the Debtors' Certified Restructuring Officer, Scouler stood in a fiduciary relationship with the Debtors.

128.    Scouler owed fiduciary obligations to the Debtors, including the duty of care.

129.    Scouler violated the duty of care owed to the Debtors in its failure to assume the NY Leases, which had significant value to the Debtors.

130.    Scouler violated the duty of care owed to the Debtors in its failure to extend the Revised Rejection Deadline so as to preserve the NY Leases, which had significant value to the Debtors.

131.    Scouler violated the duty of care owed to the Debtors in its failure to manage the Debtors' affairs pursuant to all reasonably available material information within the bounds of sound business judgment.

132.    Scouler violated the duty of care owed to the Debtors in its failure to instruct the Debtors and the Board of Directors of the negative consequences of failing to assume and/or assign the NY Leases, including but not limited to lease rejection claims that would arise pursuant to the NY Leases' respective rejections.

133.    Scouler violated the duty of care owed to the Debtors in its failure to instruct the Debtors and the Board of Directors on the importance of the lease assumption to the Debtors' ongoing business operations.

134.    Scouler violated the duty of care owed to the Debtors in its failure to instruct the Debtors of the possibilities of assignment of the NY Leases so as to preserve the NY Leases' positive cash flow to the Debtors' ongoing business operations.

135.    Scouler violated the duty of care owed to the Debtors in its failure to communicate and/or market the NY Leases to potential third party assignees so as to preserve the NY Leases' positive cash flow to the Debtors' ongoing business operations.

136.    By the aforementioned conduct, Scouler breached its fiduciary duties and obligations owed to the Debtors.

137.    Scouler's breach of the aforementioned duties caused damage to the Estates in the amount of at least $566,762.77 of lost positive cash flow generated by the NY Leases, plus interest.

138.    Scouler's breach of the aforementioned fiduciary duties caused damage to the Estates as a result of the claims filed by Paramount and LeBoeuf against the Estates.

139.    The Trustee is entitled to recovery of damages done to the Estates caused by Scouler's breach of the aforementioned duties.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order awarding compensatory, consequential, and additional damages against Scouler in such amount as to be determined by the Court, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT III

### Breach of Contract by Whiteford Taylor & Preston LLP

140.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 139 above as though fully set forth herein.

141.    The Debtors retained WTP to serve as their attorneys throughout the Chapter 11 bankruptcy proceedings.

142.    The WTP Application defined the scope of WTP's employment and representation of the Debtors.  This scope included, *inter alia*:

(a)     provision of legal advice with respect to the Debtors' powers and duties as Debtors-in-possession in the continued operation of their businesses and management of their property;

(b)     preparing on behalf of the Debtors all applications . . . and other legal papers necessary to the administration of the Debtors' estates;

(c)     negotiating, drafting and pursuing such asset dispositions, restructurings, plans of reorganization or liquidation, and recapitalizations or refinancing as needed.

143.    The WTP application created a contract between the Debtors and WTP, wherein WTP would perform the outlined services in consideration for compensation from the Debtors.

144.    WTP breached the aforementioned contract in its, *inter alia*:

(a)    failure to assume and/or assume and assign the NY Leases, which had significant value to the Debtors' businesses;

(b)    failure to extend the Revised Rejection Deadline in order to preserve the value of the NY Leases;

(c)    failure to file the necessary motions with the Court in order to assume and/or assume and assign the NY Leases;

(d)    failure to file the necessary motions with the Court in order to extend the Revised Rejection Deadline in order to preserve the value of the NY Leases;

(e)    failure to provide legal advice to the Debtors in the continued operation of their businesses and management of their property, in that WTP allowed the NY Leases to become rejected by operation of law;

(f)    failure to negotiate, draft, and pursue certain asset dispositions such as assumption and/or assumption and assignment of the NY Leases, which had significant value to the Debtors' businesses;

(g)    failure to contact or otherwise communicate with Paramount regarding an extension of the Revised Rejection Deadline; and

(h)    failure to act to prevent the Debtors from incurring rejection damage claims from LeBoeuf and Paramount pursuant to the rejection by operation of law of the NY Leases.

145.    WTP's breach of the aforementioned contract caused damage to the Estates in the amount of at least $566,762.77 of lost positive cash flow generated by the NY Leases, plus interest.

146.   WTP's breach of the aforementioned contract caused damage to the Estates as a result of the claims filed by Paramount and LeBoeuf.

147.   The Trustee is entitled to recovery of damages done to the Estates caused by WTP's breach of the aforementioned contract.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order awarding compensatory, consequential, and additional damages against WTP in such amount as to be determined by the Court, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT IV

## Breach of Contract by Scouler

148.   The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 147 above as though fully set forth herein.

149.   The Debtors retained Scouler to serve as their Chief Restructuring Officer.

150.   The Scouler Application defined the scope of Scouler's employment and representation of the Debtors.  This scope included:

(a)   reporting directly to the Debtors' Board of Directors;

(b)   developing and implementing a business plan to restructure, liquidate or otherwise maximize the value of the Debtors;

(c)   provision of services necessary to maximize recovery of the estates; and

(d)   advising the Debtors' Board of Directors with respect to the management and operation of the Debtors' businesses, including making recommendations regarding paying certain of the Debtors' bills and expenses, and managing the Debtors' affairs on a daily basis.

151.     The Scouler Application created a contract between the Debtors and Scouler, wherein Scouler would perform the outlined services in consideration for compensation from the Debtors.

152.     Scouler breached the aforementioned contract in its, *inter alia*:

(a)     failure to assume and/or assume and assign the NY Leases, which had significant value to the Debtors' businesses;

(b)     failure to extend the Revised Rejection Deadline in order to preserve the value of the NY Leases;

(c)     failure to contact and/or communicate with Paramount regarding an extension of the Revised Rejection Deadline;

(d)     failure to instruct WTP to file the necessary motions with the Court in order to assume and/or assume and assign the NY Leases;

(e)     failure to instruct WTP to file the necessary motions with the Court in order to extend the Revised Rejection Deadline in order to preserve the value of the NY Leases;

(f)     failure to timely and sufficiently recommend that the Debtors' board of directors pay certain of the Debtors' obligations with respect to the NY Leases, including but not limited to rent and expenses incurred both pre- and post-petition, thereby allowing the NY Leases to fall into default and require a significant cure;

(g)     failure to timely and sufficiently recommend that the Debtors' board of directors pay certain of the Debtors' obligations with respect to the NY Leases, including but not limited to expenses incurred both pre- and post-petition, thereby allowing the NY Leases to fall into default and require a significant cure;

(h)     failure to instruct the Debtors' board of directors on the necessity of monetizing the value of the NY Leases;

(i)     failure to inform the Debtors' board of directors of the negative consequences of a failure to assume and/or assume and assign the NY Leases, including but not limited to the filing of lease rejection claims by LeBoeuf and Paramount; and

(j)     failure to manage the Debtors' affairs, including assuming, assigning, or selling of the NY Leases so as to maximize the value of the Debtors' businesses.

153.    Scouler's breach of the aforementioned contract caused damage to the Estates in the amount of at least $566,762.77 of lost positive cash flow generated by the NY Leases, plus interest.

154.    Scouler's breach of the aforementioned contract caused damage to the Estates as a result of the claims filed by Paramount and LeBoeuf.

155.    The Trustee is entitled to recovery of damages done to the Estates caused by Scouler's breach of the aforementioned contract.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order awarding compensatory, consequential, and additional damages against Scouler in such amount as to be determined by the Court, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT V

### Professional Malpractice of Whiteford Taylor & Preston LLP

156.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 155 above as though fully set forth herein.

157.    The Debtors retained WTP to serve as their attorneys throughout the Chapter 11 bankruptcy proceedings.

158.    As the Debtors' counsel, WTP owed the Debtors a duty of care that required WTP to exercise the necessary, proper, and ordinary skill and knowledge of members of the legal profession required in connection with such representation.

159.    As counsel to the Debtors, WTP had a duty to act in the best interests of the Debtors in the Debtors' efforts to reorganize under Chapter 11.

160.    WTP breached the duties owed to the Debtors and applicable standards of care that a reasonable attorney would have exercised under the circumstances by, *inter alia*:

(a)    failing to instruct Scouler, the Debtors, and the Debtors' Board of Directors on the proper application of the laws concerning assumption and/or assumption and assignment of unexpired leases;

(b)    failing to assume the NY Leases despite Scouler's recommendations that the NY Leases provided positive value to the Debtors;

(c)    failing to seek an additional extension of the Revised Rejection Deadline;

(d)    allowing the NY Leases to be rejected by operation of law;

(e)    failing to realize the benefits of the NY Leases through monetization or other means;

(f)    failing to renew and/or re-let the NY Leases in a manner that would have had a positive impact on the Debtors' reorganization; and

(g)    causing claims to be filed against the Estates pursuant to the rejection of the NY Leases by operation of law.

161.    WTP's legal representation of the Debtors fell below the applicable standards of care and therefore breached the duties owed to the Debtors.

162.    WTP's substandard legal representation resulted in the Debtors' incurring damage.

163.    WTP's breach of the aforementioned duties caused damage to the Estates as a result of the claims filed by Paramount and LeBoeuf.

164.    WTP's breaches of the aforementioned duties caused damage to the Estates in the amount of at least $566,762.77 of lost positive cash flow generated by the NY Leases, plus interest.

165.    The Trustee is entitled to recovery of damages done to the Estates caused by WTP's malpractice.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order awarding compensatory, consequential, and additional damages against WTP in such amount as to be determined by the Court, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT VI

### Professional Malpractice of Scouler

166.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 165 above as though fully set forth herein.

167.    The Debtors retained Scouler to serve as their Certified Restructuring Officer prior to and throughout the Chapter 11 bankruptcy proceedings.

168. Scouler's relationship as an advisor to the Debtors created certain duties owed by Scouler to the Debtors.

169. As part of these duties, Scouler owed the Debtors a duty of care that required Scouler to act reasonably, professionally, and within the standards expected from a certified restructuring officer.

170. As part of these duties, Scouler was under a duty to act in the best interests of the Debtors in the Debtors' efforts to reorganize under Chapter 11.

171. Scouler breached the duties owed to the Debtors and applicable standards of care that a reasonable certified restructuring officer would have exercised under the circumstances by, *inter alia*:

(a) failing to inform the Debtors' board of directors of the necessities and consequences to the Debtors concerning the treatment of the NY Leases.

(b) failing to assume the NY Leases which would have provided positive value to the Debtors;

(c) failing to obtain an additional extension of the Revised Rejection Deadline;

(d) allowing the NY Leases to be rejected by operation of law;

(e) failing to realize the benefits of the NY Leases through monetization or other means;

(f) failing to renew and/or re-let the NY Leases in a manner that would have had a positive impact on the Debtors' reorganization;

(g) failing to assign or sell the NY Leases to LeBoeuf or another party; and

(h)     causing claims to be filed against the Estates pursuant to the rejection of the NY Leases by operation of law.

172.    Scouler's consultation advice to the Debtors fell below the applicable standards of care and therefore breached the duties owed to the Debtors.

173.    Scouler's substandard consultation advice resulted in the Debtors' incurring damage.

174.    Scouler's breach of the aforementioned duties caused damage to the Estates as a result of the claims filed by Paramount and LeBoeuf.

175.    Scouler's substandard representation and consultation caused damage to the Estates in the amount of at least $566,762.77 of lost positive cash flow from the NY Leases, plus interest.

176.    The Trustee is entitled to recovery of damages done to the Estates caused by Scouler's malpractice.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order awarding compensatory, consequential, and additional damages against Scouler in such amount as to be determined by the Court, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT VII

### Disgorgement of and Restitution for Monies Paid to Whiteford Taylor & Preston LLP

177.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 176 above as though fully set forth herein.

178.    Section 330(a)(1) of the Bankruptcy Code provides that a "court may award to a . . . professional person employed under section 327 or 1103—(A) reasonable compensation for actual, necessary services . . . ; and (B) reimbursement for actual, necessary expenses."

179.    During the course of WTP's representation of the Debtors, WTP was paid $1,422,068.04.

180.    The Court approved, on an interim basis, the allowance of only $756,259.81 in payments to WTP.

181.    WTP was paid $665,808.23 that was never approved by the Court on either an interim or final basis.

182.    Section 330(a)(5) of the Bankruptcy Code provides that "[t]he court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331, and, **if the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate**."  (emphasis added).

183.    WTP's services provided to the Debtors were not reasonable, actual, or necessary, in that, *inter alia*:

(a)    WTP failed to assume the NY Leases despite Scouler's recommendations that the NY Leases provided positive value to the Debtors;

(b)    WTP failed to seek an additional extension of the Revised Rejection Deadline;

(c)    WTP allowed the NY Leases to be rejected by operation of law;

(d)    WTP failed to realize the benefits of the NY Leases through monetization or other means;

32

(e)    WTP failed to renew and/or re-let the NY Leases in a manner that would have had a positive impact on the Debtors' reorganization; and

(f)    WTP caused claims to be filed against the Estates pursuant to the rejection of the NY Leases by operation of law.

184.    Pursuant to 11 U.S.C. § 330(a)(5), the Trustee is entitled to disgorgement of all compensation paid and restitution for all expenses reimbursed to WTP in the aggregate amount of $1,422,068.04.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order granting disgorgement of and restitution for fees and expenses paid to WTP, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT VIII

### Disgorgement of and Restitution for Monies Paid to Scouler

185.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 184 above as though fully set forth herein.

186.    Scouler's employment pursuant to the Court's Order requires review of fees and expenses pursuant to 11 U.S.C. § 330.

187.    Section 330(a)(1) of the Bankruptcy Code provides that a "court may award to a . . . professional person employed under section 327 or 1103—(A) reasonable compensation for actual, necessary services . . . ; and (B) reimbursement for actual, necessary expenses."

188.    Scouler received at least $2,015,561.28 in payments from the Debtors during the Chapter 11 reorganization.

189.   Scouler received at least $202,044.25 for services performed prepetition. Scouler also received prepetition a $50,000 retainer in anticipation of its with the Debtors.

190.   The Court never approved any payments to Scouler on a final basis.

191.   Section 330(a)(5) of the Bankruptcy Code provides that "[t]he court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331, and, **if the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate**."  (emphasis added).

192.   Scouler's services provided to the Debtors were not reasonable, actual, or necessary, in that, *inter alia*:

(a)   Scouler failed to assume the NY Leases which would have provided positive value to the Debtors;

(b)   Scouler failed to obtain an additional extension of the Revised Rejection Deadline;

(c)   Scouler allowed the NY Leases to be rejected by operation of law;

(d)   Scouler failed to realize the benefits of the NY Leases through monetization or other means;

(e)   Scouler failed to renew and/or re-let the NY Leases in a manner that would have had a positive impact on the Debtors' reorganization;

(f)   Scouler failed to assign or sell the NY Leases to LeBoeuf or another party; and

(g)   Scouler's actions with respect to the NY Leases caused claims to be filed against the Estates pursuant to the rejection of the NY Leases by operation of law.

193.    Pursuant to 11 U.S.C. § 330(a)(5), the Trustee is entitled to disgorgement of all compensation paid and restitution for all expenses reimbursed to Scouler in the aggregate amount of $2,267,605.53.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order granting disgorgement of and restitution for fees and expenses paid to Scouler, together with such other relief as is determined by this Court to be fair and equitable, including but not limited to pre-judgment and post-judgment interest at the legal rate.

## COUNT IX

### Equitable Subordination of Whiteford Taylor & Preston LLP

194.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 193 above as though fully set forth herein.

195.    The Final WTP Fee App constitutes a claim for payment from the Estates.

196.    Pursuant to section 510(c)(1) of the Bankruptcy Code, a Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]"

197.    WTP knew or should have known that the time period for assuming and/or rejecting leases was nearing its end, yet WTP failed to act to extend that time period.

198.    WTP knew or should have known that the NY Leases brought the Debtors positive cash flow, yet failed to assume the NY Leases pursuant to the Bankruptcy Code.

199.    WTP's failure to assume the NY Leases deprived the Debtors of revenue and positive cash flow.

200.    WTP's incurring of legal fees from the Debtors while costing the Debtors and their unsecured creditors valuable Estate monies created inequities in the payouts available to WTP as compared to that of the unsecured creditors.

201.    WTP's wrongful and inequitable conduct was continuing and occurring while the Debtors were insolvent and while WTP owed duties to the creditors of the Estates.

202.    WTP's wrongful and inequitable conduct deprived the Estates of valuable assets.

203.    WTP's wrongful and inequitable conduct has injured the creditors of the Estates.

204.    Despite WTP's failures and subsequent injuries to the Estates and creditors, WTP seeks compensation for services rendered, above and beyond what was paid to WTP but never approved by the Court an interim and/or final basis.

205.    Allowing WTP to receive payment of the Final WTP Fee App prior to the payment of the Estates' general unsecured creditors would be unfair and inequitable.

206.    The Final WTP Fee App should therefore be equitably subordinated to the claims of the general unsecured creditors pursuant to section 510 of the Bankruptcy Code.

207.    The Trustee therefore requests that this Court equitably subordinate the Final WTP Fee App to the claims of all general unsecured creditors.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order, pursuant to sections 510(c) and 105(a) of the Bankruptcy Code, equitably subordinating the Final WTP Fee App to all other claims filed against the Debtors.

## COUNT X

## Equitable Subordination of Scouler

36

208.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 207 above as though fully set forth herein.

209.    The Scouler Final Fee Report constitutes a claim for payment from the Estates.

210.    Pursuant to section 510(c)(1) of the Bankruptcy Code, a Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]"

211.    By engaging in the wrongful and inequitable conduct described herein, Scouler has injured the creditors of the Estates.

212.    Scouler knew or should have known that debtors in a reorganization proceeding have a limited time in which to assume or reject unexpired leases.

213.    Scouler knew or should have known that the time in which the Debtors had to assume or reject any unexpired leases was about to expire.

214.    Scouler knew or should have known that the NY Leases had not been assumed as the period to assume or reject any unexpired leases was nearing its end.

215.    Scouler knew or should have known that the NY Leases provided positive cash flow to the Debtor.

216.    Scouler knew or should have known that a failure to assume the NY Leases would be detrimental to the Debtors' reorganization.

217.    Scouler's incurring of fees from the Debtors while costing the Debtors and their unsecured creditors valuable Estate monies created inequities in the payouts available to Scouler as compared to that of the unsecured creditors.

218.    Scouler's wrongful and inequitable conduct deprived the Estates of valuable assets.

219.    Scouler's wrongful and inequitable conduct has injured the creditors of the Estates.

220.    Allowing Scouler to receive payment of the amounts listed in the Scouler Final Fee Report prior to payment of the Estates' general unsecured creditors would be unfair and inequitable.

221.    Any amounts listed in the Scouler Final Fee Report should therefore be equitably subordinated to the claims of general unsecured creditors pursuant to section 510(c) of the Bankruptcy Code.

222.    The Trustee therefore requests that this Court equitably subordinate all requests for allowance of claims by Scouler (including but not limited to the claims asserted by the Final Fee Report and the Scouler Chapter 11 Claim) to the claims of all the general unsecured creditors.

WHEREFORE, the Trustee respectfully requests that the Court enter an Order, pursuant to sections 510(c) and 105(a) of the Bankruptcy Code, equitably subordinating the Scouler Final Fee Report to all other claims filed against the Debtors.

WHEREFORE, the Trustee respectfully requests that this Court enter an Order:

1.    Requiring WTP to pay in the amount of at least $566,762.77 plus interest, as well as attorneys fees and costs incurred through resolution of this matter and other matters arising from the above alleged conduct, jointly and severally with Scouler, to the Trustee on behalf of the Estates;

38

2.      Requiring Scouler to pay in the amount of at least $566,762.77 plus interest, as well as attorneys fees and costs incurred through resolution of this matter and other matters arising from the above alleged conduct, jointly and severally with WTP, to the Trustee on behalf of the Estates;

3.      Disgorging an amount of compensation previously paid to WTP in an amount this Court deems appropriate and otherwise subordinating WTP's Fee Claim to the claims of unsecured, prepetition claims;

4.      Disgorging an amount of compensation previously paid to Scouler in an amount this Court deems appropriate, and otherwise subordinating Scouler's Final Fee Report to the claims of unsecured, prepetition claims;

5.      For such other relief this Court deems proper.


DATED: September 16, 2011                    COOCH & TAYLOR P.A.


                                             */s/ Gregory F. Fischer*
                                             Gregory F. Fischer (DSB# 5269)
                                             Henry A. Heiman (DSB# 127)
                                             The Brandywine Building
                                             1000 West Street, 10th Floor
                                             P.O. Box 1680
                                             Wilmington, DE 19899
                                             (302) 984-3800
                                             *Counsel to the Chapter 7 Trustee*